IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WARHORSE-BALTIMORE REAL          *
ESTATE, LLC et al.               *
                                 *
v.                               *          Civil Action No. WMN-13-2336
                                 *
THOMAS FORE et al.               *
                                 *
v.                               *
                                 *
VISION CAPITAL PARTNERS,         *
LLC et al.                       *
                                 *
    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

**MEMORANDUM**

Pending before the Court are two motions to dismiss.  The first, a Motion to Dismiss Counterclaim filed by Plaintiffs/Counter-Defendants Warhorse-Baltimore Real Estate, LLC ("Warhorse"), Richard Burton, Dale Dowers, and Michael Borden (collectively referred to as "the Warhorse Plaintiffs"), is fully briefed.  ECF No. 17.  No opposition has been filed as to the second motion, filed by Third-Party Defendants Vision Capital Partners, LLC ("Vision"), Edward Bailey, Victor Schwarz, and Douglas Towler (collectively referred to as "the Vision Defendants").  ECF No. 31.  The time to do so has long expired.[1]

_____

[1] On April 23, 2014, this Court approved a stipulation of the parties seeking an extension of time for Defendants/Third-Party Plaintiffs Westport Development, LLC ("Development"), Westport Partners, LLC ("Westport Partners"), Thomas Fore, and Patrick Turner (collectively referred to as "the Westport Defendants") to respond to the motion.  The stipulation provided only that

For the reasons that follow, the Court determines that no hearing is necessary, Local Rule 105.6, the Warhorse Plaintiffs' Motion will be granted in part and denied in part, and the Vision Defendants' Motion will be granted.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This case involves three groups of individuals and entities, and relates, in general terms, to the Westport Defendants' refinancing efforts related to a development project.  The Westport Defendants, seeking to avoid foreclosure and remain involved in the project, entered into negotiations with the Vision Defendants, through which they hoped to reach an agreement with the Vision Defendants for Vision to purchase the loan documents from the project's lender.  During the course of negotiations, the Vision Defendants brought in the Warhorse Plaintiffs as "consultants."  Through this arrangement, the Warhorse Plaintiffs were able to view otherwise confidential documents related to the project.  Ultimately, however, the Warhorse Plaintiffs allegedly used this information to cut the Westport Defendants out of the deal entirely by reaching an independent agreement with the lender.  The Warhorse Plaintiffs then filed suit, seeking, among other things, a declaratory judgment that the Westport Defendants lack legal recourse

---

the deadline to respond be extended until April 28, 2014.  ECF No. 33.  No further documents have been filed.

against them for the loss of the project.  The facts are set forth in more detail below.

On July 16, 2007, Citigroup Global Markets Realty Corp. ("Citi") entered into a loan agreement with Middle Branch Development, LLC, as borrower, and Inner Harbor West, LLC ("IHW") and Inner Harbor West II, LLC ("IHW II") as mortgagors ("the Loan").  The Loan was secured by, inter alia, a lien on approximately 42 acres of real property, owned by IHW and IHW II, located on the Middle Branch of Baltimore's Inner Harbor ("the Property").  The Westport Defendants and their affiliates were, at the time, planning for multi-use development of the Property ("the Westport Project").

By July 2010, the Loan was in payment default.  Citi entered into a forbearance agreement with the borrower, IHW, IHW II, Defendant/Third-Party Plaintiff Turner, and others, under which Citi agreed to forbear from foreclosing under the Loan documents and to sell the Loan for a discounted amount by a specified date.  The parties executed nine extensions of the forbearance agreement.  At the expiration of the final extension, on September 15, 2011, the Westport Defendants and their affiliates had yet to obtain financing.  On November 20, 2012, Citi commenced a foreclosure action against IHW and IHW II.

Notwithstanding Citi's commencement of a foreclosure action, the Westport Defendants continued to seek financing in order to salvage the development project and avoid foreclosure. The Westport Defendants had already begun discussions with Third-Party Defendant Vision and, as part of those discussions and negotiations, entered into a Mutual Confidentiality and Non-Disclosure Agreement ("NDA") on November 27, 2012.  The NDA provided, in relevant part:

> For a period of twelve (12) months, unless such information is obtained from other sources, Westport and Vision agree to keep confidential, secret and not disclose to any third party, without the Parties' written approval, any and all information and data obtained or received from the other party which is not currently public information, including, but not limited to, all financial information, statements, accounts, plans for the other Party which may include a possible loans [sic].
>
> Westport and Vision agree that they will not, and will require that their partners, consultants and agents and any other person to whom they show the Project to [sic] and any of that person's partners, members, officers, employees, consultants and agents, for a period of one (1) year commencing from the date of this Agreement, without the prior written consent of the other party, will not, contact directly, or indirectly, any person or entity, including but not limited to management of any person the parties have introduced the other party to or circumvent Westport and Vision position [sic] with respect to and introduced party or opportunity or any other party introduced to Westport and Vision.  Westport and Vision further agrees [sic] they, or any of the other parties referred to herein, will not enter into any agreement or relationship with any introduced party or opportunity except through the efforts and approval of Westport or Vision as the case may be.

Countercl. Ex. 2 at ¶ 1.

Vision conducted due diligence on the Project for approximately two months by, among other things, reviewing documents and speaking with representatives from the Mayor's office and the Maryland Department of Environment.  Although the Westport Project garnered interest from many potential investors, the negotiations between the Westport Defendants and Vision progressed to a point where the Westport Defendants "told the other potential partners about their relationship with Vision and said it would be inappropriate to continue their discussions unless the transaction with Vision did not proceed."  Am. Countercl. ¶ 154.  Vision submitted a letter of intent to Citi on December 27, 2012, which Citi rejected.  The parties continued to engage in discussions with Citi in an attempt to improve the terms of Vision's offer.

On January 8, 2013, Third-Party Defendant Towler told Defendant Turner that he was flying to Baltimore and bringing with him developers with whom Vision had previously worked.  Towler allegedly told Turner that the developers – Plaintiffs Burton, Dowers, and Borden – were acting as "consultants he asked to perform a final 'litmus test' to validate Vision's due diligence."[2]  Id. at ¶ 171.  The next day, Towler, Fore, Turner,

---

[2] The parties' versions of events differ as to how Plaintiffs were introduced to Turner and Fore and the knowledge that the

and individual Plaintiffs Burton, Dowers, and Borden met in Baltimore.  When Fore asked Towler regarding the individual Plaintiffs' roles in the transaction, Towler reiterated that they were there as a "litmus test" and that no investment or other role had been discussed.  Id. at ¶ 174.  Burton and Dowers also stated that they were acting as consultants to review Vision's due diligence.  Id. at ¶ 175.

On January 10, 2013, the parties met.  Towler, for Vision, outlined the terms of a proposed deal between Vision and Westport, which allegedly differed significantly from the terms that had been discussed prior to the individual Warhorse Plaintiffs' arrivals.  When Defendant Turner asked whether they could discuss extensions of the term or other modifications, Plaintiff Dowers stated that "[t]here will be no extensions – that's the deal."  Id. at ¶ 185.  At that time, Third-Party Defendant Towler remained the point person on the Project. Dowers stated that the proposal would be withdrawn if it was not accepted by Monday, January 14, 2013 at 5:00 p.m.  Neither the Warhorse Plaintiffs nor the Vision Defendants intimated that the

---

Warhorse Plaintiffs had regarding the NDA.  As further discussed infra, because the presently-pending motions are motions to dismiss the Westport Defendants' Counterclaim /Third-Party Complaint, the Court will accept the factual assertions of the Westport Defendants as true for purposes of this motion.  See Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997).

Warhorse Plaintiffs intended to assume a larger role in the transaction than had been previously disclosed.

After the initial offer was made, Turner communicated on January 11 with the Vision Defendants to further inquire regarding certain aspects of the proposal.  Without directly answering Turner's questions, Towler responded, citing "difficulties with the transaction and den[ying] that Vision had ever discussed any particular deal structure." Id. at ¶ 192. After an additional request for clarification, Towler responded that "Rick Burton will be the point person for this transaction. Please direct all communications to him." Id. at ¶ 194.  The Westport Defendants allege that, unbeknownst to them, Vision had reached a deal with Citi for purchase of the note by January 15, with a closing scheduled for the end of January.  They also allege that Vision and the Warhorse Plaintiffs reached an agreement for Burton, Dowers, and Borden to later assume Vision's position in the transaction.

On January 13, Turner and Fore for Westport met with Burton for Warhorse in Washington, D.C. to discuss a list of issues to be resolved prior to agreeing to the deal.  Burton stated that he did not have the authority to commit to any terms, but would contact his affiliates and respond.  Burton later set a deadline for acceptance of the offer of 5:00 p.m. on January 16.  When Fore asked what would happen should the parties to fail to reach

an agreement, "Burton said they intended to purchase the Note regardless."  Fore told Burton that the Westport Defendants' consent was required for any transaction with Citibank regarding the Note.  Id. at ¶ 208.

On midday of January 16, Towler informed Turner, Fore, Schwarz and Bailey that Vision would no longer be pursuing any transaction with Westport.[3]  Burton stated that the Warhorse Plaintiffs' offer was still on the table at that time, but, when the Westport Defendants did not contact him by its expiration at 5:00, he informed them that the offer was withdrawn.  In response to Fore's inquiry regarding Citi's intentions at that point, Burton responded that, to his knowledge, "they are proceeding with the foreclosure."  Id. at ¶ 216.

The next day, Fore contacted Burton to express concern that the Westport Defendants were "being played."  He stated: "I sincerely hope I don't find out you are trying to buy Citi's note while allowing us to believe the deal is dead.  So there is no possible misunderstanding, you are not authorized to enter into any agreement with Citi without our consent."  Id. at ¶ 220.  Burton responded that he "enjoy[s] the freedom of privilege of doing business with whom [he chooses]," but did not

_____

[3] Schwarz confirmed, on January 18, that Vision was not pursuing any transaction with Westport, which Towler reiterated again on January 24.

confirm that he was actively seeking to purchase the Loan.  Id.
at ¶ 221.

The Westport Defendants renewed discussions with the
alternative investors who had been put on hold pending the
Vision deal.  One of these investors confirmed that he submitted
an initial offer to Citi on January 25.  That same day, however,
Warhorse entered into an agreement with Citi to purchase the
Loan, with the initial payment submitted jointly by Burton,
Dowers, and Borden.[4]  Shortly thereafter, an involuntary chapter
7 bankruptcy petition was filed against IHW, which was later
converted into a chapter 11 case; Warhorse also filed for
chapter 11 bankruptcy on February 21, 2013.  As a result of
Warhorse's bankruptcy filing, which was ultimately dismissed "as
a bad faith filing," id. at ¶ 250, Citi "was unwilling to enter
into any transaction enabling [the Westport Defendants] to
acquire the Note or refinance the Project."  Id. at ¶ 248.  Upon
dismissal of the bankruptcy action, Citi terminated its contract
with Warhorse.

The Warhorse Plaintiffs initiated the present action
against the Westport Defendants in August 2013, seeking a
declaratory judgment and asserting claims of interference with
business relationships and fraud.  After this Court denied the

---

[4] Articles of organization for Warhorse had been filed in Nevada
on January 17, 2013.

Westport Defendants' motion to dismiss, the Westport Defendants filed a Counterclaim and Third Party Complaint, alleging intentional misrepresentation/fraud and interference with business relationships against the Warhorse Plaintiffs, as well as breach of contract, intentional misrepresentation/fraud, and conspiracy/aiding and abetting/interference with business relationships against the Vision Defendants.

## II.  **LEGAL STANDARD**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint.  Edwards v. City of Goldsboro, 178 F.3d 232, 243 (4th Cir. 1999).  To survive a 12(b)(6) challenge, a complaint need only present enough factual content to render its claims "plausible on [their] face" and enable the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Rather, "[f]actual allegations must be enough to raise a right to relief above the speculative level."  Id.  "[T]he court 'need not accept the [plaintiff's]

legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" Philips v. Pitt County Mem. Hosp., 572 F.3d 176, 180 (4th Cir. 2009) (quoting Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting Kloth v. Microsoft Corp., 444 F.3d 312, 319 (4th Cir. 2006))) (alterations in original).  In considering a motion to dismiss, the Court must "accept the well pled allegations of the complaint as true" and "construe the facts and reasonable inferences derived therefrom in the light most favorable to plaintiff."  Ibarra, 120 F.3d at 474.

### III. ANALYSIS

#### A. Counterclaim against the Warhorse Plaintiffs

##### 1. Count I — Fraud/Misrepresentation

The Warhorse Plaintiffs, while denying the allegedly fraudulent statements referred to in Count I of the Complaint, move only to dismiss those claims as they are asserted against Plaintiff/Counter-Defendant Michael Borden.  They note that, in the original counterclaim, Borden was not listed in Count I among those individuals who allegedly made fraudulent statements, nor were any statements made by him alleged in the preceding factual recitation.  In response, the Westport Defendants filed an Amended Counterclaim, ECF No. 22, which added Borden's name to Count I.  The Westport Defendants assert

that the counterclaim refers to Mr. Borden "individually or together with Mssr. Dowler and Burton over 50 times, and the allegations of his actions more than support[] the relief sought in Count I as originally filed."  ECF No. 23 at 3-4.

Although the counterclaim contains multiple references to Borden, none of those references refer to any affirmative misrepresentation made by Borden, as is required in an action for fraud based on an intentional misrepresentation.  See, e.g., Hoffman v. Stamper, 867 A.2d 276, 292 (Md. 2005) (noting that, under Maryland law,[5] an action for fraud requires, among other things, that "the defendant made a false representation to the plaintiff").  Despite the lengthy recitation of the factual allegations in this matter, not one of those allegations relates to a statement made by Borden.  Thus, to the extent that Count I asserts a claim for fraud based on an affirmative misrepresentation against Borden, it fails to state a claim for which relief can be granted.

---

[5] Although the non-disclosure agreement at issue in this case provides it will be governed and construed in accordance with Utah law, under Maryland choice of law rules, "a claim for the tort of fraud is governed by the law of the place where the injury occurred, which is the place where the last act required to complete the tort occurred."  Harte-Hanks Direct Mktg./Baltimore, Inc. v. Varilease Tech. Fin. Grp., Inc., 299 F. Supp. 2d 505, 526 (D. Md. 2004).  Accordingly, because all relevant actions here occurred in Maryland, Maryland law will apply to the tort claims in both the Counterclaim and Third-Party Complaint.  See Philip Morris Inc. v. Angeletti, 752 A.2d 200, 230-31 (Md. 2000).

Although Count I is framed as a claim for affirmative misrepresentation, it could also be conceivably read as asserting a claim for fraud based on omission.  See Am. Countercl. ¶ 254 ("As set forth herein, on numerous occasions . . . Borden . . . omitted to make statements of material facts with actual knowledge of their falsity and materiality, for the express purpose of deceiving [the Westport Defendants] and concealing their actions to allow Warhorse to enter into an agreement to purchase the Loan from Citibank . . . ."); Hoffman, 867 A.2d at 292 n.12 ("It has long been clear that '[f]raud may consist in a suppression of the truth as well as in the assertion of a falsehood.'" (quoting Schnader v. Brooks, 132 A. 381, 383 (Md. 1926))).  The Westport Defendants refer, in their Amended Counterclaim, to only one alleged omission by Borden: his knowledge that "the characterization of [Dower's, Burton's, and Borden's] role[s] as merely consultants was false."  Am. Countercl. ¶ 172.

A cause of action for fraudulent concealment of material facts requires that "(1) the defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment."

13

Green v. H & R Block, 735 A.2d 1039, 1059 (Md. 1999).  Here,
however, the Westport Defendants have not alleged any source
from which Borden would have owed them a duty to disclose
material facts.  Although they allege that Borden, among others,
"had a duty to Counterclaim and Third Party Plaintiffs not to
conceal [his] actions or enter into any agreement with
Citibank," Am. Countercl. ¶ 256, the Complaint does not provide
any factual support for that conclusory contention.  See
generally Philips, 572 F.3d at 180. Consequently, Count I fails
to state a claim as to Borden.

### 2. **Count II – Interference with Business Relationship**

The Warhorse Plaintiffs have also moved to dismiss Count
II, which was originally framed primarily as a claim for
interference with contract, on the grounds that no contract
existed between the Westport Defendants and Citi with which the
Warhorse Plaintiffs could interfere.  In response, the Westport
Defendants filed their Amended Counterclaim, which changed the
heading of Count II to "Interference with Business
Relationship."  The Westport Defendants contend that the facts,
as alleged in the original and the Amended Counterclaim, plainly
allege that the Warhorse Plaintiffs intentionally interfered
with their business or economic relationship with Citi.

To establish a claim for intentional interference with
economic relationships, a plaintiff must demonstrate "(1)

14

intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting." Painters Mill Grille, LLC v. Brown, 716 F.3d 342, 354 (4th Cir. 2013) (quoting Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc., 650 A.2d 260, 268 (Md. 1994)).  Thus, to establish tortious interference, it is "necessary to prove both a tortious intent and improper or wrongful conduct."  Macklin v. Robert Logan Assocs., 639 A.2d 112, 119 (Md. 1994).  "A plaintiff may prove tortious intent by showing that the defendant intentionally induced [the termination of the business relationship] in order to . . . benefit the defendant at the expense of the plaintiff," and improper or wrongful conduct may be established by showing that the defendant used, among other things, "injurious falsehood or other fraud."  Id.

The Warhorse Plaintiffs contend that the claims in Count II are "beyond speculative" and thus are insufficient to support a claim for interference with business relationships.  They assert that it is the Westport Defendants' failure to find funding to salvage the transaction in a timely manner, and not their actions in pursuing an agreement with Citi, that caused the Westport Defendants to fail to enter into a loan purchase

agreement with Citi.  Although that may potentially be true, the Court must take the allegations as set forth by the Counterclaim Plaintiffs as true, and, at this stage, is concerned only with whether the Counterclaim pleads sufficient facts to raise a plausible claim of a right to relief.

The Westport Defendants assert that they were close to completing a deal with Vision on terms favorable to them.  They assert that the Warhorse Plaintiffs intentionally interfered with that deal and with their relationship with Citi by, among other things, making affirmative misrepresentations, which resulted in the termination of negotiations between the Westport Defendants, Vision, and Citi, and ultimately, the termination of the Westport Defendants' relationship with Citi altogether.[6] They claim that, as a result, they have incurred damages. Because the Westport Defendants' assertions, taken as true, raise a plausible claim of relief for interference with economic relationships, the Motion will be denied as to Count II.

## B. **Third-Party Complaint against the Vision Defendants**

Third-Party Defendants filed a motion to dismiss only the fraud, and interference with economic relationship/aiding and abetting/conspiracy counts asserted in the Third Party

---

[6] Although there are allegations that Westport is still in control of the property, as a result of the improper bankruptcy filing by Warhorse and Citi's subsequent cancellation of their contract, it is plausible that Westport nonetheless has suffered damages.

Complaint.  They do not seek dismissal of Count I, which asserts a claim for breach of contract.  The Westport Defendants have not responded.  Notwithstanding the Westport Defendants' failure to respond to the motion to dismiss, however, the Court has "an obligation to review the motions to ensure that dismissal is proper."  Stevenson v. City of Seat Pleasant, 743 F.3d 411, 416 n.3 (4th Cir. 2014) (citations omitted).

### 1. **Count II – Intentional Misrepresentation/Fraud**

The Vision Defendants assert first that Count II must be dismissed because it fails to allege "with particularity the circumstances constituting fraud."  See Fed. R. Civ. P. 9(b). They appear to take issue, in part, with the structure of the Third Party Complaint, particularly with the Westport Defendants' choice to list 265 paragraphs of factual allegations first and then incorporate by reference those allegations in their fraud count, without setting forth with specificity within the fraud count the allegations supporting that claim. Additionally, they claim that the Westport Defendants failed to allege that the Vision Defendants owed a fiduciary duty requiring them to disclose withheld material facts, made any affirmative misrepresentations, or that the Westport Defendants reasonably relied on any misrepresentation to their detriment.

Generally, allegations of fraud must be pled with particularity, which requires a "description of 'the time,

17

place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" Harte-Hanks Direct Mktg., 299 F. Supp. 2d at 525 (quoting Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999)). The purpose of this requirement is to "ensure[] that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of," "protect defendants from frivolous suits[,] . . . eliminate fraud actions in which all the facts are learned after discovery[,] . . . and protect[] defendants from harm to their goodwill and reputation." Harrison, 176 F.3d at 784 (quoting United States ex rel. Stinson, Lyons, Gerlin & Bustamonte, P.A. v. Blue Cross Blue Shield of Georgia, Inc., 755 F. Supp. 1055, 1056-57 (S.D.Ga. 1990)). A court should "hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." Id.

To state a claim for fraud by affirmative misrepresentation, the plaintiff must allege

> (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation as made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of

> defrauding the plaintiff, (4) that the plaintiff
> relied on the misrepresentation and had the right to
> rely on it, and (5) that the plaintiff suffered
> compensable injury resulting from the
> misrepresentation.

Angeletti, 752 A.2d at 234 (quoting Nails v. S&R, Inc., 639 A.2d 660, 668 (Md. 1994)) (emphasis omitted).  The Vision Defendants assert that, as to Bailey and Schwarz, there are no false representations alleged; as to Towler, there are insufficient facts alleged to show that Dowers, Burton, and Borden were not consultants, ECF No. 31-1 at 12 n.4; and there are insufficient facts to show that the Westport Defendants reasonably relied on any alleged misrepresentation.

The Court agrees with the Vision Defendants that the Third Party Complaint fails to state a claim as to Bailey, as it does not refer specifically to any alleged misrepresentation made by him.  To the contrary, it appears from the Complaint that the extent of Bailey's involvement in the transaction was being copied on e-mails and, allegedly, failing to disclose material facts to the Westport Defendants.  Neither constitutes an affirmative misrepresentation necessary to state a claim for fraud by misrepresentation.

The Court finds similarly that the Complaint does not state a claim as to Third-Party Defendant Schwarz.  The representations made by Schwarz, as alleged in the Complaint, consist largely of descriptions of Vision and its business

model, Am. Countercl. ¶¶ 110, 138; steps Vision was taking
throughout the deal process, id. at ¶¶ 159, 163, 166, 177; a
statement on January 8, 2013, confirming that "the two
individuals [the Warhorse Plaintiffs] were consultants whose
only role was to validate Vision's due diligence, id. at ¶ 171;
an e-mail on January 16, 2013, stating that he had been "moved
onto a different project and not involved on Westport," id. at ¶
212; and an e-mail on January 18, 2013, stating that "Vision is
not pursuing any transaction related to Westport," id. at ¶ 223.
The Complaint cannot be read as asserting that any of these
claims, save the characterization of the Warhorse Plaintiffs as
consultants, were false.

Nonetheless, the claim against Schwarz fails for the same
reason as that asserted against Towler.  For each, the allegedly
false misrepresentations are limited to the characterization of
the Warhorse Plaintiffs' role in the transaction.  The Complaint
does not, however, adequately plead reliance.  Specifically, to
the extent that the Complaint references reliance at all, it is
limited to paragraph 257, which relates to the intentional
misrepresentation claim asserted against the Warhorse
Plaintiffs.  In that paragraph, the Westport Defendants assert
that, in reliance on various misrepresentations by all of the
parties, they

20

took no action to prevent [the Warhorse Plaintiffs]
from acquiring the Loan, and proceeded to work with
other investors to purchase the Loan on [their own]
behalf.  Had they known of [the Warhorse Plaintiffs']
activities they would have informed Citibank that
Warhorse had no authority to purchase the Loan without
[their] consent.  Instead, Warhorse signed an
agreement with Citibank thereby precluding Citibank
from contracting with other prospective purchasers.

The Third Party Complaint does not, however, connect either

Schwarz's or Towler's representations that the Warhorse

Plaintiffs were acting as consultants – even assuming that they

were false at that time – to the Warhorse Plaintiffs' eventual

action in allegedly depriving the Westport Defendants of the

opportunity to purchase the Loan documents.  Whatever theory on

which this allegation is premised is not sufficiently pleaded to

meet the particularity requirements of Rule 9(b).  Moreover, as

Vision notes, the allegations in the Third Party Complaint

clearly establish that, at least by January 16, the Vision

Defendants had made clear that they were no longer pursuing a

deal even though the Warhorse Plaintiffs were.  Thus, the

Westport Defendants knew, at that time, that the Warhorse

Plaintiffs were proceeding separately from the Vision

Defendants, and cannot seriously contend that they continued to

reasonably rely on a statement made eight days earlier that the

Warhorse Plaintiffs were acting solely as consultants.  Because

the Third Party Complaint fails to adequately plead reasonable

reliance resulting in damage to the Westport Defendants, it must be dismissed.

The Westport Defendants also appear to assert a claim for fraud on a theory of fraudulent concealment.  As in their counterclaim, however, they do not identify specifically any provision of the NDA from which a duty to disclose arose,[7] nor do they allege any legal basis for inferring such a duty.  See generally Len Stoler, Inc. v. Nat'l Auto Care Corp., Civ. No. CCB-08-288, 2009 WL 321642, at *3 (D. Md. Feb. 9, 2009) ("Given that all of the contracts in dispute were arm's-length contracts between two corporations, there was no general duty to disclose here.").  Accordingly, to the extent that Count II is intended to assert a claim for fraudulent concealment against any of the Vision Defendants, it will be dismissed.

### 2. Count III – Conspiracy; Aiding and Abetting; Interference with Business Relationships

Count III of the Third Party Complaint consists of three separate claims against the Vision Defendants – conspiracy, aiding and abetting, and interference with business relationships.  The Court determines that these claims must also

---

[7] As noted supra, in paragraph 256 of the Complaint, the Westport Defendants assert that the Vision Defendants "had actual knowledge of the NDA and had a duty to Counterclaim and Third Party Plaintiffs not to conceal their actions or enter into any agreement with Citibank."  Am. Countercl. ¶ 256.  This is, however, a legal conclusion and is not pled with sufficient factual specificity to be entitled to a presumption of truth.

be dismissed.  As noted supra, a claim for tortious interference with business relationships under Maryland law requires that the defendant act intentionally in a manner calculated, with an unlawful purpose, to cause, and actually causing, damage to plaintiff's business relationships.  See Painters Mill Grille, 716 F.3d at 354.

Here, the Westport Defendants have failed to adequately plead that the Vision Defendants interfered with the Westport Defendants' business relationship with Citi.  Specifically, they have not pled that the Vision Defendants undertook any action calculated to cause damage to that relationship.  To the contrary, the allegations in the Complaint appear to be focused primarily on the Warhorse Plaintiffs' alleged interference with economic relationships instead.  To the extent that the Vision Defendants' conduct is implicated, it appears limited to their alleged scheme to permit the Warhorse Plaintiffs to take their place in the original transaction.  See Am. Countercl. ¶¶ 285-286.  Nowhere in the Complaint does it state that the Vision Defendants sought for the Westport Defendants to be cut out of the transaction entirely; to the contrary, it appears from the allegations in the Complaint that, to the extent Vision had any motive with regard to the Warhorse Plaintiffs at all, it was simply to permit the Warhorse Plaintiffs to substitute into the transaction, in their stead.  Accordingly, the Complaint fails

to state a claim for intentional interference with economic relationships as to the Vision Defendants.

Similarly, the Court finds that the conspiracy and aiding and abetting claims must fail.  Those claims appear to be premised on an alleged overarching scheme by the Vision Defendants that the Westport Defendants be cut out of the transaction entirely, which, as noted supra, is otherwise absent from the Complaint.  Although there are allegations that the Vision Defendants violated the NDA, those allegations are not sufficient to support the Westport Defendants' ultimate theory that the Vision Defendants intended to disrupt the Westport Defendants' relationship with Citi.  Accordingly, Count III will be dismissed in its entirety.

### IV.   CONCLUSION

For the reasons stated herein, the Warhorse Plaintiffs' Motion to Dismiss will be granted in part and denied in part, and the Vision Defendants' Motion will be granted.  A separate order shall issue.

/s/
William M. Nickerson
Senior United States District Judge

DATED:   July 21, 2014